UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - :
JEAN-CLAUDE FRANCHITTI,                  : 03 Civ. 7496 (LAK)(JCF)
                                         :
                    Plaintiff,           :      REPORT AND
                                         :      RECOMMENDATION
      - against -                        :
                                         :
BLOOMBERG, L.P., and SANDRA HUTCHINS,    :
                                         :
                    Defendants.          :
- - - - - - - - - - - - - - - - - - - - - :
TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:

      Jean-Claude Franchitti brings this employment discrimination
action pursuant to Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000e et seq. ("Title VII"); 42 U.S.C. § 1981; the New
York State Human Rights Law, N.Y. Exec. Law § 296 et seq.; and the
New York City Human Rights Law, N.Y. City Admin. Code § 8-101 et
seq.  He alleges that his former employer, Bloomberg, L.P.
("Bloomberg"), and former supervisor, Sandra Hutchins,
discriminated against him because he is French, created a hostile
work environment, and retaliated against him for complaining.  The
defendants now move for summary judgment pursuant to Rule 56 of the
Federal Rules of Civil Procedure.  For the reasons that follow, I
recommend that the defendants' motion be granted in part and denied
in part.

Background

      Unless otherwise stated, the following facts are either
uncontested or construed most favorably to the plaintiff.  Dr.
Franchitti, a French citizen and legal permanent resident of the

1

United States, began working for Bloomberg in April 2002. (Amended Complaint ("Am. Compl."), ¶¶ 11, 34). He was hired as a computer scientist and trainer, responsible for training employees and updating Bloomberg's technology. (Am. Compl., ¶ 35; Plaintiff's Reply to Defendants' Local Rule 56.1 Statement, dated May 18, 2005 ("Pl. Reply 56.1 Statement"), ¶ 6).

Upon joining Bloomberg, Dr. Franchitti signed a confidentiality agreement that prohibited employees from using company equipment for personal purposes, participating in any competing entity, or attempting to induce company workers to leave Bloomberg. (Bloomberg Employee Confidentiality Agreement, dated April 22, 2002, at 2, attached as Exh. 7 to Affidavit of Thomas H. Golden ("Golden Aff.")). Bloomberg's employee handbook provides that an employee may be terminated for dishonesty, performing non-company work during business hours, improper use of company equipment, and excessive absence or tardiness. (Bloomberg's Employee Resources and Information Guide at 9-11, attached as Exh. 8 to Golden Aff.).

A. <u>Hostile Work Environment</u>

Dr. Franchitti identifies Mark Mandell as the chief protagonist in his hostile work environment claim. (Plaintiff's Reply and Objections to Defendants' First Set of Contention Interrogatories ("Pl. Interrog. Ans."), dated Feb. 28, 2005, at 2, included as Exh. 13 in Plaintiff's Appendix of Exhibits ("Pl.

2

App.")). Mr. Mandell's responsibilities included preparing work schedules, or timetables, for the classes taught by Dr. Franchitti. (Deposition of Mark Mandell, dated Nov. 3, 2004 ("Mandell Dep."), at 9-10, included as Exh. 8 in Pl. App.). Dr. Franchitti claims that Mr. Mandell's offensive conduct was more frequent and pervasive than the conduct of any other employee. (Pl. Interrog. Ans. at 2).

The offensive conduct attributed to Mr. Mandell includes: (1) Mr. Mandell's continued misspelling and misuse of French words in ten to fifteen e-mails sent to Dr. Franchitti, despite Dr. Franchitti's initial attempts to correct him and subsequent requests that Mr. Mandell address him only in English (Deposition of Jean-Claude Franchitti, dated Sept. 27, 2004 and Oct. 7, 2004 ("Pl. Dep."), at 90, 98, 105, included as Exh. 1 in Pl. App.); (2) Mr. Mandell's statement in August 2002 that it would be funny if he and Dr. Franchitti had a comedy show together in which the plaintiff would answer Mr. Mandell's questions with a French accent (Pl. Dep. at 102-03, 246); (3) Mr. Mandell's statement in September 2002 that Dr. Franchitti was not capable of preparing the work timetables because he is French (Pl. Dep. at 111); (4) Mr. Mandell's amazement that students would applaud after a lecture by Dr. Franchitti (Pl. Dep. at 267-68); (5) Mr. Mandell's comment that if Dr. Franchitti could teach, then so could he (Pl. Dep. at 268); and (6) Mr. Mandell's questioning of Dr. Franchitti's wife at a

3

business dinner about whether "French guys go out a lot" or "do anything better than American guys[.]" (Deposition of Marianna Vertsman, dated Nov. 17, 2004, at 151-52, attached as Exh. 5 to Pl. App.).

Dr. Franchitti also accuses other Bloomberg employees of engaging in discriminatory conduct. One co-worker feigned an inability to understand the plaintiff, constantly asked him to repeat himself because of his French accent, and belittled his degree from the University of Colorado and teaching position at New York University. (Pl. Dep. at 249-50). A second employee frequently greeted the plaintiff "bonjour, missieu,"[1] even after being asked by the plaintiff to address him only in English. (Pl. Dep. at 251-52). A third employee repeatedly addressed the plaintiff as "Frenchie" with a mocking expression on her face. (Pl. Dep. at 255, 257). Finally, several co-workers questioned the plaintiff about the French government's position on the war in Iraq. (Pl. Dep. at 254).

Lastly, the plaintiff claims that his former supervisor, Dr. Hutchins, discriminated against him by asking students whether they could understand his accent and by stating that he "should really speak English" while teaching. (Pl. Dep. at 268-69). Other claims

---

[1] "Bonjour" means "hello." Dr. Franchitti claims that "missieu" carries a negative connotation from the colonial era. (Pl. Dep. at 251). However, the plaintiff admits his co-worker was probably unaware of this connotation and may have been mispronouncing "monsieur," which means sir. (Pl. Dep. at 252-53).

of harassment by Dr. Hutchins are connected with her purported retaliation. (Pl. Dep. at 281). These incidents are described below.

Dr. Franchitti testified that his work environment made him feel humiliated. (Pl. Dep. at 353-54). While the plaintiff says his performance never declined, he does assert that his "feeling about being there suffered." (Pl. Dep. at 353).

B. Retaliation

According to Dr. Franchitti, Dr. Hutchins was the key player in efforts to retaliate against him. (Pl. Interrog. Ans. at 2). Dr. Franchitti states he twice complained to Dr. Hutchins about the hostile work environment. (Pl. Dep. at 399). He claims that Dr. Hutchins then began a "retaliatory campaign" that "searched for grounds to recommend [his] termination." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Memo.") at 18-19).

The first instance of alleged retaliation was the plaintiff's October 2002 performance appraisal, which was written by Dr. Hutchins. In the appraisal, Dr. Hutchins spoke highly of Dr. Franchitti's performance but was critical of his interpersonal skills. (R&D Performance Appraisal dated Oct. 23, 2002 ("Appraisal"), at 2-3, included as Exh. 16 in Pl. App.). Dr. Hutchins wrote that the plaintiff should take a communications course and improve his teamwork. (Appraisal at 5). Dr. Franchitti

objected to the report because he thought the criticisms were false and retaliatory. (Pl. Interrog. Ans. at 4). Dr. Franchitti also believed the communications course was a discriminatory reference to his French accent.[2] (Pl. Dep. at 281). The plaintiff claims he only signed the report after Glenn Jacoby, a manager at Bloomberg, promised Dr. Franchitti that he would investigate the complaints of discrimination. (Pl. Interrog. Ans. at 4). The plaintiff asserts that Dr. Hutchins and Mr. Jacoby then had an argument, during which Dr. Hutchins complained about Dr. Franchitti's discrimination claims. (Deposition of Joanna Gilberti, dated Dec. 6, 2004 ("Gilberti Dep."), included as Exh. 4 in Pl. App., at 25). Dr. Franchitti says this sequence of events led Dr. Hutchins to intensify her campaign against him. (Pl. Memo. at 18).

In October 2002, Dr. Hutchins was told that Dr. Franchitti frequently came in late, left early, was absent, asked assistants to cover his classes, and seemed to be doing outside work during business hours. (Hutchins Dep. at 86, 95, 97-98). Dr. Hutchins then asked the Human Resources Department to investigate the plaintiff. (Hutchins Dep. at 92). The investigation was performed

---

[2] The communications course "provide[s] skills and techniques for handling a variety of communication situations with greater flexibility, confidence and impact." (Description of Bloomberg's Communications Workshop, attached as Exh. 11 to Golden Aff.). As the plaintiff now realizes, it does not relate to speaking with an accent. (Deposition of Sandra Hutchins dated Dec. 3, 2004) ("Hutchins Dep."), included as Exh. 3 in Pl. App. and attached as Exh. 4 to Golden Aff., at 131; Pl. Reply 56.1 Statement, ¶ 37).

by Lisa Jennings.  (Hutchins Dep. at 93).

Ms. Jennings first met with the plaintiff in early November to discuss possible conflicts with work he was performing at New York University.  (Pl. Dep. at 399).  At this meeting, Dr. Franchitti says he informed Ms. Jennings of what he perceived to be a hostile work environment.  (Pl. Dep. at 401).

In November 2002, Dr. Hutchins discovered a document on the local hard drive of a Bloomberg computer that contained a to-do list created by the plaintiff.  (Hutchins Dep. at 144).  After reading portions of the list, Dr. Hutchins gave it to Ms. Jennings. (Hutchins Dep. at 149-50).  The list contained dates and times for various meetings.  ("To-do List," included as Exh. 22 in Pl. App., at BLP02401-03).  Since several of these meetings were scheduled on workdays, Ms. Jennings inferred that Dr. Franchitti missed work to attend the meetings.  (Deposition of Lisa Jennings dated Dec. 7, 2004 ("Jennings Dep."), included as Exh. 2 in Pl. App., at 91). The list also mentioned other Bloomberg employees, one of whom told Ms. Jennings that he was asked by the plaintiff to join a start-up company.  (To-do List at BLP02401-03; Affidavit of Jon Edward Steiner, dated April 29, 2003, attached as Exh. 17 to Golden Aff., ¶ 3).

The plaintiff eventually learned that he was being investigated for attempting to hire people away from Bloomberg and demanded a meeting with Ms. Jennings.  (Pl. Dep. at 413-14).  At

the meeting, Ms. Jennings questioned the plaintiff about the To-do List, (Pl. Dep. at 417-18), and he was unable to answer some of the questions.  (Pl. Reply 56.1 Statement at 23).

Ms. Jennings reported her findings to Pamela Morris, a manager in Human Resources.  (Affidavit of Pamela Morris, dated March 30, 2005 ("Morris Aff."), ¶¶ 1, 3-4).  Ms. Morris concluded that the plaintiff may have been involved in an outside business and may have solicited other Bloomberg employees to work on non-Bloomberg projects.  (Morris Aff., ¶ 6).  She also concluded that Dr. Franchitti was not forthcoming when asked about the To-do List.  (Morris Aff., ¶ 8).  After Ms. Morris discussed the matter with Linda Norris, Bloomberg's global manager of Human Resources, it was decided that Dr. Franchitti should be terminated.  (Morris Aff., ¶ 10).  The plaintiff was informed of his termination on November 19, 2002.  (Pl. Dep. at 430-31).  Dr. Franchitti believes that Dr. Hutchins also recommended his firing.  (Pl. Memo. at 32).

C. Procedural History

In March 2003, Dr. Franchitti filed a charge of discrimination with the Equal Employment Opportunity Commission.  (Am. Compl., ¶ 9).  It was dismissed on June 25, 2003, and the plaintiff was provided notice of his right to sue.  (Dismissal and Notice of Rights, attached as Exh. 29 to Golden Aff.).  Dr. Franchitti filed a pro se complaint in the instant action on September 24, 2003.  (Am. Compl., ¶ 9).  Since then, he retained counsel, and I granted

the plaintiff's motion to amend his complaint on October 20, 2004.

Subsequent discovery has produced additional evidence of the plaintiff's extracurricular activities while employed at Bloomberg. First, the plaintiff admits he met with a nonprofit group during Bloomberg business hours to explore the commercial viability of a software program he had designed with several students. (Pl. Reply 56.1 Statement at 11, 13; Pl. Interrog. Ans. at 6-7). Second, Dr. Franchitti admits he set up a corporation in Nevada so it could purchase real estate in Catskill, New York. (Pl. Reply 56.1 Statement at 8-9). Third, the plaintiff concedes he spoke with a co-worker about creating documentation for a project. (Pl. Dep. at 224-25).

The defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. They assert that Dr. Franchitti's allegations of harassment do not constitute a hostile work environment. The defendants also claim that Dr. Franchitti has failed to demonstrate that the reasons they offer for his dismissal are a pretext for discrimination or retaliation.

<u>Discussion</u>

A. <u>Standard for Summary Judgment</u>

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c).  In reviewing the record, all evidence must be assessed in the light most favorable to the nonmovant and all reasonable inferences must be drawn in his favor.  See Delaware & Hudson Railway Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990).

"[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them."  Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994).  "[S]ummary judgment must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving partying."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 465 (2d Cir. 2001) (quotation marks and citation omitted).

Summary judgment is also generally inappropriate where the defendant's state of mind is at issue.  See Gelb v. Board of Elections of the City of New York, 224 F.3d 149, 157 (2d Cir. 2000).  Therefore, it should be granted with caution in employment discrimination cases.  See Gallo, 22 F.3d at 1224.  However, the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable."  McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994).  Instead, "the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to . . . other

areas of litigation." <u>Abdu-Brisson</u>, 239 F.3d at 466; <u>Meiri v.</u> <u>Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985).

To survive summary judgment, the nonmoving party cannot rely on mere allegations or denials. Fed. R. Civ. P. 56(e). Instead, it must present affirmative evidence showing a genuine issue for trial. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986). Where a party relies on its own pleadings, testimony or affidavits to oppose summary judgment, these statements must be made on personal knowledge. <u>See</u> <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 219 (2d Cir. 2004). Conclusory assertions and statements made upon information and belief are insufficient to create a genuine issue of material fact. <u>Id.</u>

B. <u>Claims Against Defendant Bloomberg</u>

1. <u>Hostile Work Environment</u>

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This language reaches not only economic discrimination, but also the creation or tolerance of a discriminatory hostile environment. <u>See</u>

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).[3]

A work environment is considered hostile if it is "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." Id. at 21 (citation omitted). The conduct in question must have created an environment that was both subjectively and objectively hostile. See id. at 21-22.

For an employer to be held liable for permitting a hostile work environment, the plaintiff must also demonstrate that the offensive conduct should be imputed to the employer. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 70-71 (1986); Kotcher v. Rosa & Sullivan Appliance Center, Inc., 957 F.2d 59, 63 (2d Cir. 1992). The plaintiff can do so by proving that the employer knew of the harassment but failed to address it. See Faragher v. City of Boca Raton, 524 U.S. 775, 789 (1998); Kotcher, 957 F.2d at 63.

Dr. Franchitti's complaints of discrimination show he subjectively perceived that his work environment was hostile. Therefore, the questions that remain are whether the environment was objectively hostile and, if so, whether Bloomberg can be held liable for permitting such a situation to exist.

---

[3] The plaintiff brings claims under Title VII, 42 U.S.C. § 1981, and the New York State and City Human Rights Laws. Unless otherwise noted, the same analysis applies under all of these provisions. See Ifill v. United Parcel Service, No. 04 Civ 5963, 2005 WL 736151, at *5 n.3 (S.D.N.Y. March 29, 2005).

To determine whether a workplace was objectively hostile, a court must examine the case-specific circumstances in their totality. See Harris, 510 U.S. at 23. In doing so, factors to consider include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or merely an offensive utterance; (4) whether it unreasonably interfered with the employee's work performance; and (5) its effect on the employee's psychological well-being. Id. A plaintiff can succeed with such a claim by demonstrating either that "a single incident was extraordinarily severe or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of his working environment." Cruz v. Coach Stores, 202 F.3d 560, 570 (2d Cir. 2000) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)).

"While the standard for establishing a hostile work environment is high, [the Second Circuit has] repeatedly cautioned against setting the bar too high, noting that . . . the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (quotation marks, citations, and emphasis omitted). "The environment need not be unendurable or intolerable." Id. (quotation marks and citation omitted).

Dr. Franchitti has testified that his work performance did not

suffer as a result of the discriminatory acts, and he presents no evidence that they were physically threatening or affected his psychological well-being. These factors, however, are not required to find an objectively hostile work environment. See Harris, 510 U.S. at 23 ("[N]o single factor is required.").

Dr. Franchitti's allegations of discriminatory harassment break down as follows. Three accusations were isolated events in which the plaintiff's national origin was directly insulted: Mr. Mandell's comedy show and timetabling comments, as well as his questioning of Dr. Franchitti's wife. Five others were repeated events dealing with Dr. Franchitti's national origin: Mr. Mandell's e-mails to the plaintiff, another co-worker's feigned inability to understand the plaintiff's accent, frequent derogatory greetings by a third employee, a fourth individual's addressing the plaintiff as "Frenchie," and several co-workers' questioning of Mr. Franchitti about the French government's position on the war in Iraq. Three allegations were isolated events that did not directly relate to Dr. Franchitti's national origin: Mr. Mandell's amazement at applause received by the plaintiff after a lecture, Mr. Mandell's disparaging remarks about the plaintiff's teaching skills, and the deprecation of the plaintiff's education and teaching position by the co-worker who constantly asked the plaintiff to repeat himself

because of his French accent.[4]   The plaintiff also alleges that the Human Resources investigation of his outside activities contributed to the hostile work environment.  For Dr. Franchitti's claim to survive summary judgment, a reasonable jury must be able to find that these allegations were continuous enough to alter the conditions of the plaintiff's work environment.

The defendants attempt to separate Dr. Franchitti's allegations of harassment and undermine them individually.  While it is true that several of the plaintiff's claims would fall short if viewed in isolation, I must consider them as a whole.  Dr. Franchitti asserts that he faced almost daily harassment because of his national origin.  Although most of Dr. Franchitti's allegations are not severe, a reasonable jury could conclude that the frequency of the harassment altered the plaintiff's work environment.  See Macri v. Newburgh Enlarged City School District, No. 01 Civ. 1670, 2004 WL 1277990, at *11-12 (S.D.N.Y. June 8, 2004)(denying summary judgment when comparatively mild comments were frequently repeated).

Liability for the plaintiff's work environment can also be imputed to Bloomberg.  For the purposes of summary judgment, I must

_____

[4]  Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could consider this facially neutral harassment to have contributed to the hostile work environment. See Raniola v. Bratton, 243 F.3d 610, 622 (2d Cir. 2001)("We have held that prior derogatory comments by a co-worker may permit an inference that further abusive treatment by the same person was motivated by the same [bias] manifested in the earlier comments.").

accept the plaintiff's testimony that he informed his superiors and other officials of the harassment he faced, as required by the Bloomberg employee handbook.  As such, the knowledge of these officials can be imputed to Bloomberg.  See Distasio v. Perkin Elmer Corp., 157 F.3d 55, 64 (2d Cir. 1998)("An official's knowledge will be imputed to an employer when . . . the official is charged with a duty to inform the company of the harassment.").

Since the harassment is alleged to have persisted throughout the plaintiff's employment, and since the defendants offer no proof that they investigated Dr. Franchitti's complaints, they can be held liable for his hostile work environment.  While the defendants present a question of fact regarding the veracity of the plaintiff's testimony, the resolution of this question turns on credibility assessments that are inappropriate at this stage. Therefore, summary judgment should be denied on the hostile work environment claims.

### 2. Discriminatory Discharge and Disparate Treatment

Title VII employment discrimination claims based on circumstantial evidence are examined under the burden shifting model first established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The plaintiff must first establish a prima facie case of discrimination.  Id. at 802.  To do so, he must show that: (1) he belongs to a protected class; (2) he was qualified for the position held; (3) he suffered an adverse employment action; and

16

(4) the circumstances surrounding the adverse employment action give rise to an inference of discrimination. See Cruz, 202 F.3d at 567. At the summary judgment stage, the burden of establishing a prima facie case is minimal. See Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001). Once a prima facie case is made out, the law creates a presumption that the employer unlawfully discriminated against the plaintiff. See Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997).

The burden then shifts to the defendants to articulate a nondiscriminatory reason for the adverse employment action. See Cruz, 202 F.3d at 567; McDonnell Douglas, 411 U.S. at 802. This burden is one of production, not persuasion; it can involve no credibility assessment. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000). If the defendants' burden is met, the McDonnell Douglas framework disappears. See id. at 142-43. All that remains is for the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's legitimate reasons were merely a pretext for discrimination. See id. at 143.

Dr. Franchitti is able to meet the minimal burden of establishing a prima facie case: (1) he belongs to a protected class; (2) he was qualified for the position held, as evidenced by his hiring and largely positive performance review; (3) his termination qualifies as an adverse employment action; and (4) the alleged instances of discriminatory harassment occurred under

circumstances giving rise to an inference of discrimination. Accordingly, the plaintiff has created a presumption that Bloomberg unlawfully discriminated.

The defendants, however, have eliminated this presumption by articulating legitimate reasons for Dr. Franchitti's termination. The defendants contend that the plaintiff was fired for lying about his creation of the To-do List, conducting outside business during working hours, and attempting to induce Bloomberg employees to leave their positions within the company. The plaintiff is unable to rebut these legitimate reasons by showing that they are pretextural and that the real reason was discriminatory. His conclusory statements of discrimination and unsupported allegations of disparate treatment are not enough to prevent summary judgment.

Bloomberg presents evidence that, prior to Dr. Franchitti's termination, it was informed that the plaintiff frequently missed work and appeared to be doing outside work during business hours. Bloomberg subsequently discovered the plaintiff's To-do List, which provided independent confirmation that Dr. Franchitti held outside meetings during working hours. Bloomberg was then told that the plaintiff had asked another employee to create documentation for an outside project. This led Bloomberg to believe that the plaintiff was inducing co-workers to leave the company. According to its employee handbook, employment can be terminated for any of these violations.

Subsequent discovery has corroborated Bloomberg's beliefs. Dr. Franchitti concedes that he missed work to attend a meeting where he explored the commercial viability of a software program. He also admits he spoke to a co-worker about creating documentation for an outside project. These admissions weigh against a finding of pretext. See Gant v. Wallingford Board of Education, 195 F.3d 134, 147 n.17 (2d Cir. 1999)("When a factfinder considers whether a defendant's asserted nondiscriminatory reason was a true basis for its decision, whether the asserted nondiscriminatory reason was true at all is highly relevant.").

Dr. Franchitti attempts to rebut the defendants' proffered reasons and to prove discrimination by introducing a disparate treatment argument. (Pl. Memo. at 38). The plaintiff presents evidence that Jon Steiner, another Bloomberg employee who violated company policy, only received a warning for his conduct. (Pl. Memo. at 38-39; Hutchins Dep. at 185). Mr. Steiner's violation was improper internet usage. (Hutchins Dep. at 185). Dr. Franchitti asserts that his own termination, when contrasted with Mr. Steiner's warning, shows disparate treatment. (Pl. Memo. at 39-40). This argument fails.

When a plaintiff seeks to show he was subjected to disparate treatment, he must show he was similarly situated in all material respects to the individuals with whom he seeks to compare himself. Graham v. Long Island Rail Road, 230 F.3d 34, 39 (2d Cir. 2000).

This "all material respects" standard requires the plaintiff to show that similarly situated employees who went undisciplined engaged in comparable, although not necessarily identical, conduct. Id. at 40.

Dr. Franchitti's disparate treatment claim falls short because the plaintiff has not shown that he was similarly situated to Mr. Steiner in all material respects. It is clear that the plaintiff and Mr. Steiner violated several of the same policies, including improper personal use of company equipment and performing other than company work during working hours. However, that was the full extent of Mr. Steiner's violations and just the beginning of Dr. Franchitti's. The plaintiff was also suspected of lying, having a spotty attendance record, and having attempted to induce another employee to leave the company. The conduct of the two is therefore not comparable.

The plaintiff is also unable to point to any evidence that discrimination motivated his dismissal. The defendants present evidence that the termination decision was made by Pamela Morris, with the approval of Linda Norris and Bloomberg's Chief Executive Officer. (Morris Aff., ¶¶ 10, 11). The plaintiff presents no evidence that any of these officers bore discriminatory animus against him. Instead, he merely asserts that the termination decision was actually made by Dr. Hutchins. (Pl. Reply 56.1 Statement at 25). Such a statement, made solely upon information

and belief, is insufficient to defeat summary judgment. <u>See</u> <u>Weinstock v. Columbia University</u>, 224 F.3d 33, 41 (2d Cir. 2000)("[U]nsupported allegations do not create a material issue of fact.").

Since the plaintiff offers no affirmative evidence to rebut as pretextual the legitimate reasons for his termination, the defendants' motion for summary judgment with respect to Dr. Franchitti's claims of discriminatory discharge and disparate treatment should be granted.

### 3. <u>Retaliation</u>

Title VII also makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this [subchapter]." 42 U.S.C. § 2000e-3(a). This section is violated when "an employer is motivated by a retaliatory animus, even if valid objective reasons for the discharge exist." <u>Cosgrove v.</u> <u>Sears, Roebuck & Co.</u>, 9 F.3d 1033, 1039 (2d Cir. 1993). The retaliatory motive, however, must be at least a substantial or motivating factor for the adverse action. <u>See</u> <u>Mt. Healthy City</u> <u>School District Board of Education v. Doyle</u>, 429 U.S. 274, 287 (1977); <u>Raniola</u>, 243 F.3d at 625.

The allocation of burdens of proof in retaliatory discharge claims is determined by <u>McDonnell Douglas</u>. <u>See</u> <u>Cosgrove</u>, 9 F.3d at 1038. To establish a prima facie case of retaliation, the

plaintiff must demonstrate that: (1) he was engaged in an activity protected under Title VII; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action. See Mack v. Otis Elevator Co., 326 F.3d 116, 129 (2d Cir. 2003).

"To prove that he engaged in [a] protected activity, the plaintiff need not establish that the conduct opposed was in fact a violation of Title VII." Manoharan v. Columbia University College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988). (citation omitted). Instead, he must only demonstrate that he had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. See id.

The requisite causal connection can be established directly through evidence of retaliatory animus directed against the plaintiff. See DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987). The causal connection can also be established indirectly, either by showing temporal proximity between the protected activity and the adverse action or by offering evidence of disparate treatment of others engaged in similar conduct. See id.

Dr. Franchitti asserts that retaliation can be inferred from the negative comments in his performance review, from the

investigation launched by Human Resources, and from his termination.

The plaintiff satisfies the first requirement of the prima facie case by demonstrating a good faith, reasonable belief that his hostile work environment violated the law. See Macri, 2004 WL 1277990, at *17 (finding plaintiff's belief to be reasonable because her claims were substantial enough to survive summary judgment). Therefore, the plaintiff's complaints to Bloomberg officials can be considered protected activity. See Gregory v. Daly, 243 F.3d 687, 700 (2d Cir. 2001)("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination[.]"). Likewise, Dr. Franchitti's complaints satisfy the second requirement of the prima facie case -- employer awareness -- since those officials were charged with the responsibility to investigate such claims.

Dr. Franchitti's negative performance review, however, fails to qualify as an adverse action. Dr. Franchitti was not fired, reassigned or otherwise tangibly affected by the performance report. He only alleges that the review contributed to his hostile work environment. By itself, however, the comments in the review are too isolated to have altered the plaintiff's work environment. Since "[r]eprimands that do not lead to materially adverse employment consequences are generally not considered actionable forms of retaliation," Brierly v. Deer Park Union Free School

District, 359 F. Supp. 2d 275, 300 (E.D.N.Y. 2005), the plaintiff's retaliation claim based on his performance review fails as a matter of law.

The investigation of the plaintiff and his subsequent termination, on the other hand, do satisfy the adverse action requirement. Dr. Franchitti also indirectly establishes a causal connection by showing that his complaints about discrimination were followed closely by the investigation and termination. Having done so, the plaintiff has established a prima facie case of retaliation with respect to the investigation and termination.

The burden then shifts to the defendants to articulate a nondiscriminatory rationale for their actions. The defendants do so by stating that the plaintiff was investigated following reports of his frequent absences and was fired for dishonesty, for performing outside work during business hours, and for inducing employees to leave the company. The defendants have also produced evidence that the employees to whom Dr. Franchitti complained about harassment played no role in the decision to terminate him. (Morris Aff., ¶¶ 14-15). Moreover, one of the managers who did make the decision has stated that she did not know of Dr. Franchitti's complaints prior to his termination. (Morris Aff., ¶ 13).

To survive summary judgment, Dr. Franchitti need not disprove the defendants' proffered rationale. See Holtz v. Rockefeller &

Co., 258 F.3d 62, 78-79 (2d Cir. 2001); <u>Fields v. New York State</u> <u>Office of Mental Retardation & Developmental Disabilities</u>, 115 F.3d 116, 120 (2d Cir. 1997). Instead, he must only offer sufficient evidence to allow a reasonable jury to find that the defendants intentionally retaliated against him for engaging in protected activity. <u>See</u> <u>Gordon v. New York City Board of Education</u>, 232 F.3d 111, 117 (2d Cir. 2000); <u>Cosgrove</u>, 9 F.3d at 1039; <u>Kodenga v.</u> <u>International Business Machines Corp.</u>, 88 F. Supp. 2d 236, 244 (S.D.N.Y. 2000).

The plaintiff has satisfied this burden by producing independent evidence that Dr. Hutchins complained about Dr. Franchitti's claims of discrimination during an argument with Mr. Jacoby. Since the plaintiff has produced evidence that could allow a reasonable jury to find a retaliatory motive in the investigation that led to his termination, summary judgment should be denied.

C. <u>Claims Against Defendant Sandra Hutchins</u>

While individuals may not be held personally liable under Title VII, <u>see</u> <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1313 (2d Cir. 1995), they may be liable under 42 U.S.C. § 1981, the New York City Human Rights Law and the New York State Human Rights Law. <u>See</u> <u>Ifill</u>, 2005 WL 736151, at *3. Section 1981 states that "all persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white

citizens." 42 U.S.C. § 1981(a). The New York State Human Rights Law provides that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article," including employment discrimination on the basis of national origin. N.Y. Exec. Law §§ 296(1)(a), 296(6). The language of the New York City Human Rights Law is similar. See N.Y.C. Admin. Code § 8-107(6).

In order to make out a § 1981 claim against an individual, a plaintiff must demonstrate an affirmative link causally connecting the individual with the discriminatory action. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000). A claim of personal liability must be predicated on the actor's personal involvement. See id. Similarly, the Second Circuit has held that an individual can only be held liable under the New York State and City aiding and abetting provisions if that person actually participated in the conduct giving rise to the discrimination claim. See Tomka, 66 F.3d at 1317; Sowemino v. D.A.O.R. Security, Inc., 43 F. Supp. 2d 477, 487 (S.D.N.Y. 1999).

### 1. Hostile Work Environment

The allegations of Dr. Hutchins' involvement in Dr. Franchitti's hostile work environment include her: (1) questioning students about whether they could understand the plaintiff's accent; (2) commenting that Dr. Franchitti should speak English while teaching; (3) recommending that the plaintiff take a

communications course; and (4) initiating the Human Resources investigation. (Pl. Memo. at 9-22). While the comments attributed to Dr. Hutchins are mild and infrequent, her central role in the allegedly retaliatory investigation qualifies as actual participation in the plaintiff's hostile work environment. Therefore, summary judgment on the hostile work environment claim against Dr. Hutchins is inappropriate.

### 2. Discriminatory Discharge and Disparate Treatment

As stated above, Dr. Franchitti's statements made upon information and belief are not enough to raise a triable issue with respect to Dr. Hutchins' role in the decision to terminate his employment.  Since the plaintiff presents no evidence that Dr. Hutchins was personally involved in the termination decision, she cannot be held liable for claims of discriminatory discharge or disparate treatment.  Moreover, under the New York State and City Human Rights Laws, liability must first be established as to the employer before accessorial liability can be imposed upon an alleged aider and abettor.  See DeWitt v. Lieberman, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999).  Since summary judgement should be granted with respect to the discriminatory discharge and disparate treatment claims against Bloomberg, it should also be granted with respect to the aiding and abetting claims against Dr. Hutchins.

### 3. Retaliation

Dr. Hutchins admits she was involved in the investigation that

27

led to Dr. Franchitti's termination. (Hutchins Dep. at 92-93). She disputes, however, that she was motivated by retaliatory animus. Dr. Franchitti brings this into question by proffering evidence that Dr. Hutchins was angered by his complaints about discrimination. (Gilberti Dep. at 25). Since there is a genuine issue of material fact as to Dr. Hutchins' motivation in initiating the investigation of Dr. Franchitti, and retaliation can be found even if some of the reasons for the investigation were legitimate, summary judgment should be denied. This result comports with the Second Circuit's admonition that summary judgment is generally inappropriate where the defendant's state of mind is at issue.

Conclusion

For the reasons stated above, I recommend that the defendants' motion for summary judgment be granted with respect to Dr. Franchitti's claims of discriminatory discharge, disparate treatment, and retaliation related to his performance review. Summary judgment should be denied, however, with respect to the hostile work environment and remaining retaliation claims. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Lewis A. Kaplan, Room 1310, and to the chambers of the

undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.

Failure to file timely objections with preclude appellate review.

Respectfully submitted.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          August 12, 2005

Copies mailed this date to:

Robert B. Davis, Esq.
100 Lafayette Street, Suite 601
New York, New York  10013

Thomas H. Golden, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York  10019

29